IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| NATHAN MALAN,<br><br>             Plaintiff,<br><br><br>v.<br><br><br>RKB INDUSTRIAL, INC. dba KIMBER KABLE, an Idaho corporation, and RAY KIMBER, an individual,<br><br>             Defendants. | **ORDER AND MEMORANDUM DECISION GRANTING PLAINTFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 1:22-cv-00025-TC-DAO<br><br><br>Judge Tena Campbell<br>Magistrate Judge Daphne A. Oberg |

Before the court are cross motions for summary judgment and partial summary judgment in an action that arises out of events that occurred in 2018, when Plaintiff Nathan Malan suffered a near-fatal mountain biking accident. After spending weeks in the hospital, Mr. Malan was terminated from his employment at RKB Industrial, Inc. dba Kimber Kable (RKB Industrial), where he had worked for approximately 32 years. Mr. Malan alleges that his termination and the process that led to his termination occurred in violation of the Americans with Disabilities Act (ADA) (Am. Compl., ECF No. 23 at ¶¶ 68–84). He moves for partial summary judgment on his second cause of action, for termination of employment in violation of the ADA under the "regarded as" prong of the statute (ECF No. 54).

The Defendants, Ray Kimber and his company, RKB Industrial, move for summary judgment on all claims (ECF No. 67), arguing that Mr. Malan refused to provide a release from his physician stating that he was able to return to work and that he did not adequately disclose his

1

damages.

For the reasons discussed below, the court grants Mr. Malan's motion for partial summary judgment and denies the Defendants' motion for summary judgment.

**FACTUAL BACKGROUND**

RKB Industrial is a small business owned by Mr. Kimber and located in Ogden, Utah. (See RKB Industrial EEOC Position Statement 1, Ex. 7 to Pl.'s Mot. Summ. J., ECF No. 54-8.) The company manufactures and sells wire and cable for home audio and video systems. (Id.) Mr. Malan has worked for RKB Industrial since 1986, when he was hired as a Production Assistant/Gofer. (Dep. Ray Kimber 26:21–28:7, Ex. 3 to Pl.'s Mot. Summ. J., ECF No. 54-4.) At the time of the events described below, he was responsible for purchasing products and customer service. (See RKB Industrial EECO Position Statement 2.)

Mr. Malan is legally blind. (Dep. Nathan Malan 20:24–21:10, Ex. 4 to Pl.'s Mot. Summ. J., ECF No. 54-5.) Due to an eye disorder called retinitis pigmentosa, his eyesight has diminished significantly over the past few decades, leading to night blindness and tunnel vision. (Id.) His eyesight did not prevent him from successfully performing his job, and RKB Industrial has previously offered him reasonable accommodations. (See Pl.'s Resp. to Interrogatory 4 at 7, Ex. 6 to Defs.' Opp'n, ECF No. 77-7 ("Plaintiff is, and was at all times herein, legally blind, and was offered accommodations by RKB Industrial, Inc., which included transportation to/from work, large monitors for his computer, and dictation software.").)

On April 26, 2018, Mr. Malan suffered a serious accident while mountain biking in southern Utah. (Kimber Dep. 68:17–69:15; RKB Industrial EEOC Position Statement at 2;

Malan Discharge Medical Records 1, Ex. 8 to Pl.'s Mot. Summ. J., ECF No. 54-9.[1])  In part due to his diminished eyesight, Mr. Malan rode his bike off a 30-foot cliff.  (Malan Discharge Medical Records 1.)  He was airlifted to a trauma specialist facility in Grand Junction, Colorado, where he remained until May 16, 2018, when a critical care team transported him to a hospital in Utah.  (Id. at 1–2.)  His injuries were extensive, including multiple pelvic fractures, multiple rib fractures, multiple fractures to his vertebrae, and bruising to his pelvis and abdomen.  (Id. at 1.)  He was also diagnosed with a traumatic brain injury.  (Id.)

Mr. Malan's family set up a Facebook page to provide updates about his condition. (Malan Updates Facebook Page, Ex. 10 to Pl.'s Mot. Summ. J., ECF No. 54-11.[2])  Mr. Kimber testified that he checked the Facebook page "at least once a day" to learn how Mr. Malan was doing.  (Kimber Dep. 71:5–72:11.)  Mr. Kimber stated that Mr. Malan's injuries "seemed to be pretty serious" given that the Facebook reports "were talking about the gray matter being separated from other parts of the brain matter …."  (Id. 125:11–15.)  RKB Industrial's Controller, Lonny Gould, visited Mr. Malan in the Utah hospital in late May and testified that Mr. Malan "wasn't a hundred percent" but "could communicate."  (Dep. Lonny Gould 67:3–16, 76:23–77:13, Ex. 1 to Pl.'s Mot. Summ. J., ECF No. 54-2.)  In June, Mr. Malan spoke with another co-worker, Brett Terry, who testified that Mr. Malan's speech was slower than normal,

[1] The Defendants object to the use of Mr. Malan's medical records as hearsay.  (See Defs.' Opp'n 5, ECF No. 77.)  But "[a]t the summary judgment stage, evidence need not be submitted 'in a form that would be admissible at trial.'"  Argo v. Blue Cross Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)).  The court finds that Mr. Malan may lay sufficient foundation at trial for his medical records to be admitted under Federal Rule of Evidence 803(6), and therefore the court will rely on these records at summary judgment to demonstrate that Mr. Malan's injuries were severe.

[2] The Defendants object to references to the Facebook page as hearsay.  (See Defs.' Opp'n 7–8.)  But what is relevant to the Defendants' motivation for firing Mr. Malan is Mr. Kimber's deposition testimony about what he learned from the Facebook page, not the truth of any information posted on the page.

which gave Mr. Terry some concerns about Mr. Malan's cognitive abilities, but that Mr. Malan "was able to answer questions when I asked him how he was doing."[3] (Dep. Brett Terry 45:4–47:1, Ex. 5 to Pl.'s Mot. Summ. J., ECF No. 54-6.)

Mr. Malan was released from the hospital on June 8, 2018. (Malan Discharge Medical Records 1.) He had recovered sufficiently that he was able to walk out of the hospital to his car. (Malan Updates Facebook Page KK000061.[4])

On June 6, 2018, two days before he was discharged from the hospital, Mr. Malan texted Mr. Kimber: "Are you awake?" Mr. Kimber responded: "Yes. But eating breakfast and talking with somebody." Mr. Malan then texted: "Call me when you have a moment." (Kimber Dep. 120:1–10; see Malan Dep. 120:19–23.) Having not heard back, Mr. Malan called Mr. Kimber ten days later, on June 16, 2018, and said that he would like to return to work. (Kimber Dep. 120:22–25; 176:1–177:17.) Mr. Kimber responded: "Nate, I'll have to get back to you." (Id. 178:10–12.)

Mr. Kimber texted Mr. Malan later that day: "Hi Nate. I think it would be best to have a meeting with your doctor(s) before you come back to work at any level. I am so uncertain and apprehensive. And I am really sad to send this message." (Text Message from Ray Kimber to Nathan Malan dated June 16, 2018, Ex. 11 to Pl.'s Mot. Summ. J., ECF No. 54-12.) Mr. Malan

---

[3] Mr. Malan points out that Mr. Kimber never visited him in the hospital. Mr. Kimber testified that Mr. Malan's wife, Gretchen, "chastised me a little bit for reaching out to her, saying, you know, 'Just refer to the—this [Facebook] page ….'" (Kimber Dep. 160:16–20.) According to Mr. Kimber, the Facebook page stated that no visitors outside of family were allowed and that Malan was in a low stimulation environment: "I was cautious about responding because I had been essentially warned off." (Id. 142:14–25.) The court finds that it is immaterial why Mr. Kimber did not visit Mr. Malan in the hospital.

[4] Again, the Defendants object to any facts derived from the Facebook page. (See Defs.' Opp'n 14.) Mr. Malan may testify to this fact himself at trial. In any event, the Defendants do not present any evidence to suggest that Mr. Malan was unable to walk by the time he was discharged from the hospital.

responded two days later: "I agree Ray and no worries … for today I will just drop by say hi to

whoever is around and grab some medical bills … thank you for your concern[.]"  (Text

Message from Nathan Malan to Ray Kimber dated June 18, 2018, Ex. 11 to Pl.'s Mot. Summ. J.,

ECF No. 54-12.)

After this exchange with Mr. Malan, Mr. Kimber texted Mr. Gould.  Mr. Kimber first

wrote: "Malan called me to say he wanted to come back to work on Monday.  I thought about it

for a few hours and then sent him this text[.]"[5]  Mr. Gould responded: "Glad he thinks he [sic]

feeling better, did he think a few hours a week??  I agree with you [sic] response …."  Mr.

Kimber then texted: "He said he thought it would be fine, but errors in what he was thinking

resulted in a fall over a cliff[.]"  (Text Messages between Ray Kimber and Lonny Gould dated

June 16, 2018, Ex. 13 to Pl.'s Mot. Summ. J., ECF No. 54-14.)

On June 17, 2018, Mr. Malan scheduled a visit with Dr. Chad Jensen.[6]  (Malan Dep.

98:21–99:17.)  Mr. Malan also visited the RKB Industrial office on June 18, 2018, but had

limited interactions with Mr. Kimber.  (Kimber Dep. 89:23–93:11, 128:19–22.)  Mr. Gould

recalled that Mr. Malan was moving more slowly than normal during that visit.  (Gould Dep.

89:11–91:13.)  And Mr. Terry testified that it was "remarkable that [Mr. Malan] was walking and

talking."  (Terry Dep. 55:1–2.)

Mr. Malan met with Dr. Jensen on June 28, 2018.  (Dep. Chad Jensen, M.D. 8:21–9:3,

---

[5] Mr. Kimber included a copy of his June 16, 2018 text to Mr. Malan, reproduced in full above.

[6] The Defendants dispute whether Dr. Jensen was Mr. Malan's primary physician when Mr.
Malan made this appointment.  (See Defs.' Opp'n 16–17.)  In response to a question about when
Mr. Malan became his patient, Dr. Jensen testified: "I know I saw [Mr. Malan] shortly after the
accident, but I can't recall honestly if I saw him prior to the accident.  I knew him before the
accident because I took care of his children and his wife, but I can't remember when I first saw
him as a patient to be honest."  (Dep. Chad Jensen, M.D. 6:13–18, Ex. 2 to Pl.'s Mot. Summ. J.,
ECF No. 54-3.)  The court finds that it is immaterial whether Mr. Malan established care with
Dr. Jensen before June 17, 2018.

Ex. 2 to Pl.'s Mot. Summ. J., ECF No. 54-3.)  Dr. Jensen had reviewed Mr. Malan's medical

records from the hospitals in Colorado and Utah and was familiar with the accident.  (Id. 7:25–

8:12.)  Dr. Jensen was surprised by how well Mr. Malan had recovered:

> I can't believe my eyes.  I reviewed his records from Grand Junction and he
> had—I mean, it was a serious injury, and I was very surprised how well he
> recovered in that short of time…. I mean, I think most people would not have
> survived that injury, to be honest.  And he walked in and was talking to me and
> was pretty remarkable.

(Id. 9:24–10:9.)

Mr. Malan sent an update about his health over text to Mr. Kimber and Mr. Gould on

July 6, 2018, which stated:

> I have been released from speech therapy, they are in charge of my cognitive
> skills.  Physical therapy is going well and I am slowly regaining the use of my
> right arm.  I have an appointment on Monday with Dr. Finlayson who will check
> my hips and pelvis.  I am waiting for Dr. Blake Welling to get back in town so he
> can check my neck and back.  I am slowly regaining my life back, I am able to
> shower and get dressed by myself—I'm getting stronger every day and I am
> confident I will be able to start working again soon (a few hours a day at first)[.]  I
> miss seeing you guys and I miss Kimber Kable—hope to talk to you soon.

(Text Message from Nathan Malan to Ray Kimber and Lonny Gould dated July 6, 2018, Ex. 14

to Pl.'s Mot. Summ. J., ECF No. 54-15.)  Mr. Kimber did not respond to this text or ask for

clarifications about Mr. Malan's medical condition.  (See Kimber Dep. 182:10–185:15.)  Mr.

Malan sent another text on July 10, 2018, indicating that pelvic X-rays showed improvement:

"Good news—Dr. Finlaysons [sic] office X-ray'd [sic] my hips and pelvis yesterday and other

than no running and heavy lifting I am in the clear…."  (Text Message from Nathan Malan to

Ray Kimber and Lonny Gould dated July 10, 2018, Ex. 14 to Pl.'s Mot. Summ. J., ECF

No. 54-15.)

Mr. Malan sent a text to Mr. Kimber the following day—July 11, 2018—asking to meet:

"Hey Ray are you at Kimber and can I stop by in a few minutes on my way back home from

Murray[?]"  Mr. Kimber responded: "I am at drum corps today[.]"  Mr. Malan then wrote: "Ok I will talk to you another time …."  (Text Messages between Nathan Malan and Ray Kimber dated July 11, 2018, Ex. 11 to Pl.'s Mot. Summ. J., ECF No. 54-12.)

Mr. Malan attended another appointment with Dr. Jensen on July 19, 2018, who gave him a letter releasing him to return to work that read: "Nathan, [sic] has recovered well from his recent injury.  He should come to the point I think it safer [sic] him to return to work for 1–3 hours per day and then gradually increase his hours as able."  (Release Letter from Dr. Chad Jensen dated July 19, 2018, Ex. 16 to Pl.'s Mot. Summ. J., ECF No. 54-17.)  Dr. Jensen wrote in his clinic notes from that appointment that Mr. Malan had had a "[r]emarkable recovery" and later testified that there was "no indication that [Mr. Malan] wasn't thinking clearly … in the visit."  (Clinic Notes dated July 19, 2018, Ex. 15 to Pl.'s Mot. Summ. J., ECF No. 54-16[7]; Jensen Dep. 27:3–15.)  Dr. Jensen believed that Mr. Malan was "functioning well.  He cognitively—he was fine.  There was no obvious reason he could not return to work, and so he was cleared to begin integrating back into employment….  My expectation at that time [i.e., on July 19, 2018] is he could start returning to work immediately."  (Jensen Dep. 13:20–23, 14:19–20.)

Mr. Malan then texted Mr. Kimber: "Hi Ray, when would be a good time to meet?  I would like to plan my return to work, I've been cleared by the doctors and I'm ready to go …."  Mr. Kimber responded, "I don't know how to answer that" and suggested that he was busy the next day.  Mr. Malan then texted: "I could meet Saturday or Sunday if that works better for you?"  (Text Messages between Nathan Malan and Ray Kimber dated July 19, 2018, Ex. 11 to Pl.'s Mot. Summ. J., ECF No. 54-12.)  On July 20, 2018, Mr. Kimber responded more fully:

---

[7] The Defendants object to the use of Dr. Jensen's clinic notes as hearsay.  (See Defs.' Opp'n 23.)  The court finds that Mr. Malan may lay the appropriate foundation at trial to admit these records under Federal Rule of Evidence 803(6).

Hi Nate.  I am sorry but meeting with you is beyond my ability to try and figure anything out.  And we have paid you more than 300 hours of time above and beyond all of your sick days and vacation days.  We have continuously tried to figure out what to do and have sought advice.  It seems illogical to rely on anyone with a brain injury to self-evaluate.  And it is illogical for anyone here at [RKB Industrial] to evaluate such a condition.  We will have to rely on a legal intermediary to help us navigate this heartbreaking situation, and hired one last week.  No matter what his letter to you looks like you should know that we WANT to be helpful but we are beyond our ability to cope.  After you get his letter we will want to try and figure out any options, such as insurance ramifications.  It will look like an unkind re-set, we were out of options.  The letter was done before your texts to me yesterday.

(Text Message from Ray Kimber to Nathan Malan dated July 20, 2018, Ex. 11 to Pl.'s Mot.

Summ. J., ECF No. 54-12.)  Mr. Malan responded by text as follows:

I am a bit dumbfounded Ray as I have done everything you requested.  Do you recall my text from July 6th (see below[8])—believe me that there is no self evaluating in this instance, only professionals that can vouch for my cognitive abilities.  I really think that texting back and forth in this case has been non productive and that is why I have tried several times to meet with you.  I want to meet with you before opening and reading the incoming letter.  I can meet anytime.

(Text Message from Nathan Malan to Ray Kimber dated July 20, 2018, Ex. 11 to Pl.'s Mot.

Summ. J., ECF No. 54-12.)

Mr. Kimber did not respond to Mr. Malan's text but did send a text to a group of RKB Industrial employees that stated: "Malan sent me texts wanting to meet over the weekend but that is beyond my capability to try and figure out what to say or what to do.  So I have spent the last couple of hours composing a text message to Malan and have sent it.  Here is what I sent: …"[9]

(Text Message from Ray Kimber to RKB Industrial Employees dated July 20, 2018, Ex. 18 to Pl.'s Mot. Summ. J., ECF No. 54-19.)

---

[8] The July 6, 2018 text references Mr. Malan's release from speech therapy and is reproduced in full above.

[9] Mr. Kimber included a copy of his July 20, 2018 text to Mr. Malan, reproduced in full above.

Receiving no response from Mr. Kimber, Mr. Malan sent another text to Mr. Kimber on July 24, 2018, stating:

> Ray my world has been turned inside out since the day I wrecked, this is by far the biggest test of my life even including blindness.  I could really use your friendship and advise [sic] in the days to come.  I have not received the letter and most likely will not today due to the holiday.  I am terrified at this point of the possibly [sic] of no health insurance or income—just know that there are chances of even bigger fights health wise for me.  Please can you and I sit down to discuss things?

(Text Message from Nathan Malan to Ray Kimber dated July 24, 2018, Ex. 11 to Pl.'s Mot. Summ. J., ECF No. 54-12.)  Mr. Kimber did not respond.

Mr. Malan went to RKB Industrial's office on July 25, 2018.  He testified in his deposition that he was intending to work.  (Malan Dep. 97:3–6, 101:11–102:6.)  Mr. Gould testified that Mr. Malan said he was "ready to return to work" and had a "return to work … letter" that he wanted to give Mr. Kimber.  (Gould Dep. 95:15–18.)  The Defendants maintain that Mr. Malan knew he would receive a termination letter that day, citing an angry text that Mr. Malan's sister-in-law sent to Mr. Gould a few days earlier.[10]  (See Text from Lee Iman Petersen to Lonny Gould dated July 21, 2018, Ex. 9 to Defs.' Mot. Summ. J., ECF No. 67-10.)

Regardless of the parties' differing characterizations of why Mr. Malan returned to the office, the parties agree that Mr. Malan did not give Mr. Kimber the medical release letter.[11]  Instead, Mr. Kimber went to the office of RKB Industrial's attorney, Royce J. Richards, and

---

[10] The court is not sure what to make of this text, which appears to be from "Lee Iman Petersen" and is presented without context.  The Defendants refer to the sender as Lee Ann Iman, Mr. Malan's sister-in-law, and allege that the text was sent to Mr. Gould.  (See Defs.' Mot. Summ. J. 12–13, ECF No. 67.)  The text states: "I used to think you were one of the good guys.  You fooled a LOT of people."  This message is followed by an expletive on behalf of the sender's sister, whom the Defendants assert is Mr. Malan's wife.

[11] Mr. Malan asserts that he had no opportunity to give Mr. Kimber the letter.  (Pl.'s Mot. Summ. J. 17, ECF No. 17.)

returned with a letter of termination that he handed to Mr. Malan.  Mr. Kimber then left the

office.  The termination letter stated:

> Dear Mr. Malan:
>
> It is unfortunate that I have been retained to notify you of your termination from
> employment by R.K.B. Industrial, Inc. DBA Kimber Kable.  Of course, this
> termination is necessary due to your current medical condition which has made
> the performance of your work impossible.  Personally, I was saddened to hear of
> your biking accident that has caused you so much pain, suffering and difficulty.
> However, I have advised Kimber Kable to stop paying further wages and benefits
> due to the hardship those payments are on the business.
>
> You have suffered an unfortunate accident that affects you but also has had
> financial consequences to Kimber Kable.  You have been paid all of the accrued
> sick leave and vacation time you had earned prior to the accident.  In addition,
> Kimber Kable has paid over 300 additional hours to help you during your
> recovery period.  At this point, it appears you will not be able to timely return to
> Kimber Kable in your prior position.  As such, we have no choice but to
> discontinue further gratuitous payments.

(Letter from Royce J. Richards to Nathan Malan dated July 19, 2018, Ex. 19 to Pl.'s Mot. Summ.

J., ECF No. 54-20.)

Mr. Malan filed a Charge of Discrimination with the Equal Employment Opportunity

Commission on March 28, 2019.  (EEOC Charge of Discrimination, Ex. 5 to Defs.' Mot.

Summ. J., ECF No. 67-6.)  He then filed this action on February 17, 2022.  (See Compl., ECF

No. 2.)

## LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  Material facts are those that might affect the outcome of the case.  See Birch v.

Polaris Indus., Inc., 812 F.3d 1238, 1251 (10th Cir. 2015) ("Only disputes over facts that might

affect the outcome of the suit under the governing law will properly preclude the entry of

summary judgment.").

Once the movant shows there is an absence of a genuine dispute of material fact, <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (citation omitted), the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u> "[W]hile [courts] draw all reasonable inferences in favor of the non-moving party, 'an inference is unreasonable if it requires a degree of <u>speculation</u> and conjecture that renders [the factfinder's] findings <u>a guess or mere possibility</u>.'" <u>GeoMetWatch Corp. v. Behunin</u>, 38 F.4th 1183, 1200 (10th Cir. 2022) (quoting <u>Pioneer Ctrs. Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.</u>, 858 F.3d 1324, 1334 (10th Cir. 2017)).

"The standard for cross-motions for summary judgments is the same as for individual motions for summary judgment." <u>Cannon v. State Farm Mut. Auto. Ins. Co.</u>, No. 2:13-cv-186, 2013 WL 5563303, at *1 (D. Utah Oct. 7, 2013) (citation omitted). "[The court] must view each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor." <u>Boyz Sanitation Serv., Inc. v. City of Rawlins</u>, 889 F.3d 1189, 1195 (10th Cir. 2018).

## ANALYSIS

The Defendants move for summary judgment on all claims against them, whereas Mr. Malan only moves for summary judgment on his second claim for termination in violation of the ADA—and, specifically, Mr. Malan's motion is limited to the "regarded as" prong of the statutory definition of "disability." The court begins its analysis with a discussion of this ADA

claim.

## I.      Termination in Violation of the ADA

The ADA prohibits covered employers from discriminating against a "qualified

individual on the basis of disability" regarding hiring, advancement, training, termination, and

"other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  A "qualified

individual" means "an individual who, with or without reasonable accommodation, can perform

the essential functions of the employment position that such individual holds or desires."

42 U.S.C. § 12111(8).  To prevail on an ADA claim, a plaintiff must establish: "(1) [he] is a

disabled person as defined by the ADA; (2) [he] is qualified, with or without reasonable

accommodation, to perform the essential functions of the job held or desired; and (3) [his]

employer discriminated against [him] because of [his] disability."  MacKenzie v. City & Cnty. of

Denver, 414 F.3d 1266, 1274 (10th Cir. 2005), abrogated on other grounds by Lincoln v. BNSF

Ry. Co., 900 F.3d 1166 (10th Cir. 2018).  The parties dispute whether Mr. Malan has satisfied

the first and third elements.

Under the ADA Amendments Act of 2008 (ADAAA), the definition of disability was

expanded to include:

> (A) a physical or mental impairment that substantially limits one or more major
>     life activities of such individual;
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment (as described in paragraph (3)).

42 U.S.C. § 12102(1).  Paragraph 3, in turn, provides:

> An individual meets the requirement of "being regarded as having such an
> impairment" if the individual establishes that he or she has been subjected to an
> action prohibited under this chapter because of an actual or perceived physical or
> mental impairment whether or not the impairment limits or is perceived to limit a
> major life activity.

42 U.S.C. § 12102(3)(A).  It is this "regarded as" prong under which Mr. Malan claims that RKB

Industrial terminated his employment in violation of the ADA (or, more specifically, the

ADAAA).

**A.   "Regarded As" Prong**

To prove discrimination under the "regarded as" prong of the statutory definition of

"disability," Mr. Malan need not show that his impairments substantially limited a major life

function:

> Thus, the ADAAA has defined disability differently for "regarded as" claims than
> did the ADA and our caselaw interpreting the ADA.  Today, a plaintiff bringing a
> "regarded as" claim "needs to plead and prove only that [he] was regarded as
> having a physical or mental impairment."  Mercado [v. Puerto Rico, 814 F.3d
> 581, 588 (1st Cir. 2016)].  Unlike pre-ADAAA plaintiffs, an ADAAA plaintiff no
> longer needs to plead and prove that the actual or perceived impairment
> "substantially limited one or more major life activities."  Id.; see Morriss v. BNSF
> Ry. Co., 817 F.3d 1104, 1111 (8th Cir. 2016) ("[T]he EEOC [has taken] the
> position that it is not necessary to determine whether an individual is
> 'substantially limited' in any major life activity' for 'regarded as' disabled cases."
> (quoting 29 C.F.R. app. § 1630.2(j))).

Adair v. City of Muskogee, 823 F.3d 1297, 1306 (10th Cir. 2016).

Rather, Mr. Malan "must show that (1) [he] has an actual or perceived impairment,

(2) that impairment is neither transitory nor minor, and (3) the employer was aware of and

therefore perceived the impairment at the time of the alleged discriminatory action."  Neri v. Bd.

of Educ. for Albuquerque Pub. Schs., 860 F. App'x 556, 563 (10th Cir. 2021) (citation omitted).

The court agrees with Mr. Malan that there is no genuine dispute of material fact about

whether he has satisfied all three elements.

1.  Actual or perceived impairment

Mr. Malan has produced overwhelming evidence that he suffered a serious accident that

affected him both mentally and physically.  Mr. Malan biked off a cliff and was airlifted from the

scene of his accident to a trauma center, after which he spent six weeks in the hospital.  His

physician testified that "most people would not have survived" such a "serious injury." (Jensen Dep. 9:21–10:9.) Mr. Kimber also believed that Mr. Malan was impaired, testifying that Mr. Malan's injuries "seemed to be pretty serious." (Kimber Dep. 125:14–15.) Accordingly, the court finds that there is no genuine dispute of material fact about whether Mr. Malan had an actual or perceived impairment.

### 2. Transitory and minor

Second, Mr. Malan's impairments were not minor. Mr. Malan's injuries seriously affected his strength and mobility, requiring speech therapy and rehabilitation. (See Text from Malan to Kimber dated July 6, 2018 ("I am slowly regaining my life back, I am able to shower and get dressed by myself—I'm getting stronger every day …."].) Mr. Malan's hospital discharge records reflect that he suffered "extensive, multiple injuries[,]" including a traumatic brain injury and multiple fractures to his pelvis, vertebrae, ribs, and shoulder. (Malan Discharge Medical Records 1–2.) Both Mr. Gould and Mr. Terry testified that Mr. Malan's speech and communication were impaired after the accident. (See Gould Dep. 67:3–16; Terry Dep. 45:4–47:1.) And, of course, Mr. Malan had been and remained legally blind.

The Defendants argue that even if Mr. Malan's impairments were not minor, they were nevertheless transitory, pointing out that Mr. Malan stated that he was ready to return to work in July and noting that the statutory definition of "transitory impairment" is "an impairment with an actual or expected duration of 6 months or less." 42 U.S.C. § 12102(3)(B). The Defendants maintain that Mr. Malan has produced evidence of only one permanent injury: the ossification of his elbow,[12] which the Defendants contend was not disclosed at the time Mr. Malan was fired.

---

[12] In his deposition, Mr. Malan described this ossification as follows: "[M]y elbow does not work. It's locked…. Because I had—when I was healing and my brain was repairing, … my

(See Defs.' Opp'n 33.)

The court is skeptical that any reasonable juror would agree with the Defendants' characterization of Mr. Malan's injuries as transitory.  Setting aside the dispute about his elbow, Mr. Malan will likely have multiple, lifelong effects from injuries of this magnitude.  But the court need not resolve this question because—having already found that Mr. Malan's impairments were not minor—any dispute about whether Mr. Malan's injuries were also transitory is immaterial.  For a party to be excluded from proceeding under the "regarded as" prong under 42 U.S.C. § 12102(1)(C), an impairment must be both transitory and minor.  See Adair, 823 F.3d at 1306 (discussed further below).

A brief digression is necessary to address the Defendants' argument to the contrary, as the statute contains a grammatical ambiguity.  The relevant provision reads: "Paragraph (1)(C) shall not apply to impairments that are transitory and minor."  42 U.S.C. § 12102(3)(B).  The ambiguity arises due to the use of the word "and" as a conjunction joining two elements of a list that follows a negative command ("Paragraph (1)(C) shall not apply").  Based on the text alone, the statute could be read in two ways: 1) an impairment must be both transitory and minor for a party to be excluded from the "regarded as" prong; or 2) an impairment that is either transitory or minor will exclude a party.

The Supreme Court recently addressed a similar question of statutory construction concerning a list of three requirements that render a criminal defendant ineligible for safety-valve relief. [13]  Pulsifer v. United States, 144 S. Ct. 718 (2024).  The relevant statutory language

---

brain formed bones all through my elbow that shouldn't be there.  So that's why it doesn't work."  (Malan Dep. 72:14–25.)

[13] A defendant who is eligible for safety-valve relief becomes exempt from a mandatory minimum sentence.  See 18 U.S.C. § 3553(f).

states that, assuming four other criteria are also satisfied, a defendant will be eligible for the

safety-valve if "the court finds at sentencing" that:

> the defendant does not have—
>
> > (A) more than 4 criminal history points …;
> > (B) a prior 3-point offense …; and
> > (C) a prior 2-point violent offense ….

18 U.S.C. § 3553(f)(1) (emphasis added).  Once again, an ambiguity arises because the word

"and" is used conjunctively in a list (here, with three elements) that is preceded by a negative

clause ("the defendant does not have").  The question presented was whether a defendant's

ineligibility hinged on satisfaction of all or merely any of the three requirements—in other

words, whether the statutory "and" should really be read as an "or."[14]  See Pulsifer, 144 S. Ct.

at 725.  The Court held that either construction was grammatically permissible.  Id. at 726.  The

Court then turned to the legal context of the statute as a whole to resolve the ambiguity, id. at

731, finding that a defendant who fails any one of the three elements (but not necessarily all

three) is ineligible for safety-valve relief.  Id. at 737.

 The Defendants point out that, in at least one case, the Tenth Circuit has read the

"transitory and minor" requirement to mean that either transitory or minor injuries will bar a

plaintiff from relief under the "regarded as" prong.  In Skerce v. Torgenson Electric Company,

the Tenth Circuit stated that a plaintiff "cannot proceed on a claim that he is regarded as disabled

if he has a temporary impairment lasting six months or less."  852 F. App'x 357, 362 (10th Cir.

2021).  By omitting any discussion of whether the plaintiff's injury was minor, the Tenth

---

[14] The court provided an everyday example of both constructions.  The command "don't drink and drive" is understood to mean that one should not do both activities at the same time.  In contrast, the command "don't eat and drink before surgery" is more commonly understood as: "don't eat or drink before surgery."  See Pulsifer, 144 S. Ct. at 730.

Circuit's opinion in <u>Skerce</u> suggests that a plaintiff demonstrating only transitory injuries (even transitory injuries that are not minor) cannot succeed under the "regarded as" prong.

The court declines to follow that interpretation.  First, <u>Skerce</u> is an unpublished opinion and not binding precedent.  <u>Id.</u> at 357.  More importantly, the <u>Skerce</u> court did not engage in a lengthy discussion of the "regarded as" prong and did not discuss the grammatical ambiguity.  <u>See id.</u> at 362.  Third, the Tenth Circuit has elsewhere stated (in an opinion that <u>is</u> binding on this court and is cited by <u>Skerce</u>, <u>see id.</u> at 361) that, under the "regarded as" prong, a plaintiff must show that their "impairment is neither transitory nor binding."  <u>Adair</u>, 823 F.3d at 1306.  The "neither … nor" reformulation of the statutory language implies that an impairment must be both transitory <u>and</u> minor before a plaintiff will be barred from a "regarded as" claim.  Finally, this issue has been addressed comprehensively and persuasively by the Third Circuit.

In <u>Eshleman v. Patrick Industries, Inc.</u>, the Third Circuit held that impairments should only be excluded from coverage under the "regarded as" prong if they are both transitory <u>and</u> minor.  961 F.3d 242, 247–48 (3d Cir. 2020).  First, the Third Circuit noted that the statute distinguishes "transitory" and "minor," as the statute "specifically defines 'transitory' as 'an impairment with an actual or expected duration of 6 months or less.'  The ADA does not, however, apply this definition to minor."  <u>Id.</u> at 247.  Next, the Third Circuit referenced the regulations promulgated under the ADA, which are clear on this issue: "To establish this defense, a covered entity must demonstrate that the impairment is both 'transitory' <u>and</u> 'minor.'" 29 C.F.R. § 1630.15(f) (emphasis added).  Finally, the Third Circuit pointed out that its interpretation was consistent with the legislative history of the ADA amendments:

> [E]xcluding only impairments that are both transitory and minor is consistent with
> Congress' intent to expand ADA coverage through the ADA Amendments Act
> of 2008.  As the House Judiciary Committee Report on the ADAAA explains,
> when including "regarded as" claims under the ADA "Congress did not expect or

intend that this would be a difficult standard to meet."  The Report further
explains that the "transitory and minor" exception was intended to weed out only
"claims at the lowest end of the spectrum of severity," such as "common ailments
like the cold or flu," and that the exception "should be construed narrowly."
Treating transitory and minor as separate and distinct elements is therefore
consistent with the intent to afford broad coverage under the "regarded as"
provision.

Eshleman, 961 F.3d at 248 (cleaned up).

Adopting this reasoning, the court finds that Mr. Malan may succeed under the "regarded as" prong of the ADA unless the Defendants can raise a genuine issue about whether his injuries were both transitory and minor.  Furthermore, Mr. Malan has provided sufficient evidence to show that a reasonable juror could not find that his injuries were minor.  Accordingly, even if the Defendants dispute whether his injuries were transitory, Mr. Malan has demonstrated that there are no genuine disputes of material fact about whether he has satisfied the second element of the "regarded as" prong.

### 3.  Perception of impairment

Mr. Malan has produced substantial and undisputed evidence that his employer perceived him as being impaired at the time of his termination.  Concerning the weeks Mr. Malan spent in the hospital, Mr. Kimber testified as follows:

> I didn't know if [Mr. Malan] was—I'm going to use the word "coherent" or
> "lucent" or mentally capable of having a conversation….  Well, I mean, I looked
> at his—the Facebook reports and they were talking about the gray matter being
> separated from other parts of the brain matter and that seemed—I mean, I'm not a
> doctor, but that seemed to be pretty serious.

(Kimber Dep. 125:6–15.)  And in his last text to Mr. Malan, Mr. Kimber stated: "It seems illogical to rely on anyone with a brain injury to self-evaluate."  (Text from Kimber to Malan dated July 20, 2018.)  Finally, as discussed further below, the termination letter given to Mr. Malan explicitly stated that "this termination is necessary due to your current medical condition

which has made the performance of your work impossible." (Letter from Richards to Malan dated July 19, 2018.) Given this evidence, Mr. Malan has demonstrated that his employer perceived him as being impaired at the time that he was fired.

For the foregoing reasons, the court finds that Mr. Malan has satisfied the three elements of the "regarded as" prong and has shown that Mr. Kimber and RKB Industrial regarded him as being disabled.

### B. Termination Due to Disability

Although the court has found no genuine disputes of material fact about whether Mr. Kimber and RKB Industrial regarded Mr. Malan as being disabled, the court must also determine if there are genuine disputes of material fact about whether this perception of Mr. Malan was the reason the Defendants terminated Mr. Malan's employment. The court finds that no reasonable jury could determine that Mr. Malan was terminated for any other reason.

A plaintiff seeking to prove a claim under the ADAAA may "prove discrimination by providing direct evidence of discriminatory conduct." Tesone v. Empire Mktg. Strategies, 942 F.3d 979, 995 (10th Cir. 2019). Such evidence may include oral and written statements. See Kendrick v. Penske Transp. Servs., 220 F.3d 1220, 1225 (10th Cir. 2000) ("[O]ral or written statements on the part of a defendant showing a discriminatory motivation" may also constitute "direct evidence of discrimination").

Where evidence of discrimination is circumstantial, a plaintiff's case is subject to the burden-shifting framework set forth in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973). That analysis proceeds as follows:

> [T]he plaintiff first bears the burden of proving a prima facie case of discrimination. If the plaintiff successfully proves a prima facie case, the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action. Once the employer identifies a legitimate reason for its

action, the burden shifts back to the employee to prove that the proffered legitimate reason was a pretext for discrimination.

Riggs v. AirTran Airways, Inc., 497 F.3d 1108, 1114–15 (10th Cir. 2007).

Mr. Malan argues that the court need not reach the McDonnell Douglas analysis because he asserts there is direct evidence of discrimination. Specifically, Mr. Malan points to his termination letter, which stated:

> Of course, this termination is necessary due to your current medical condition which has made the performance of your work impossible…. You have suffered an unfortunate accident that affects you but also has had financial consequences to Kimber Kable…. At this point, it appears you will not be able to timely return to Kimber Kable in your prior position.

(Letter from Richards to Malan dated July 19, 2018.)

This letter and these facts are similar to the facts in a case from the Middle District of Tennessee, in which the court granted summary judgment in favor of the plaintiff on his ADA claim after the plaintiff was fired from his job at a car wash due to his employer's perception of his heart condition. Lovell v. Champion Car Wash, LLC, 969 F. Supp. 2d 945, 954 (M.D. Tenn. 2013). The plaintiff had received the following termination letter from his employer:

> I take health issues seriously, particularly heart related issues. Since I now have a doctor's note in my possession, liability for your heart issue is now passed along to me. If you got overheated … and it caused further damage or injury to your heart, I would be liable and open to a lawsuit…. Since you cannot perform your job duties as needed, I am going to have to release you, for medical reasons, from employment ….

Id. at 949. The Lovell court concluded that the letter was "direct evidence of disability discrimination" as it "specifically state[d] that Plaintiff [was] being terminated for medical reasons …." Id. at 951. The Tenth Circuit has cited Lovell with approval as an example of a discrimination case involving direct evidence. Herrmann v. Salt Lake City Corp., 21 F.4th 666, 679 (10th Cir. 2021) (noting that Lovell was a case "where a plaintiff's disability was the sole

reason expressed for the termination").

Here, the court agrees with Mr. Malan that the termination letter is clear—he was fired due to his medical condition.  The letter thereby provides direct evidence of discrimination.  Mr. Kimber confirmed that Mr. Malan was fired due to his current medical condition (Kimber Dep. 199:11–18) and that Mr. Kimber understood the words "current medical condition" in Mr. Malan's termination letter to refer to the injuries Mr. Malan suffered as a result of his bike accident.  (Id. 205:7–10.)  That understanding is corroborated by statements Mr. Kimber made to Mr. Malan over text.  (See, e.g., Text from Kimber to Malan dated July 20, 2018 ("It seems illogical to rely on anyone with a brain injury to self-evaluate.").)

Even if the court did apply the McDonnell Douglas burden-shifting framework, the Defendants have not brought forward any evidence to show a non-pretextual reason for Mr. Malan's termination.  The Defendants argue that the real reason Mr. Malan was terminated is twofold: 1) because he refused to provide Mr. Kimber a physician's release to return to work; and 2) because he had not been back at work for months.  But on the evidence presented, the court finds that no reasonable jury could agree that Mr. Malan did anything other than what was requested of him to return to work.

The Defendants contend that Mr. Kimber clearly demanded a doctor's release from Mr. Malan by sending Mr. Malan the following text: "Hi Nate.  I think it would be best to have a meeting with your doctor(s) before you come back to work at any level."  (Text from Kimber to Malan dated June 16, 2018.)  The parties dispute how Mr. Malan interpreted that text, and whether Mr. Kimber was asking to meet Mr. Malan's doctors himself or to have Mr. Malan obtain the work release.  But the court finds that this dispute is immaterial because the Defendants have not produced evidence that Mr. Kimber ever followed up this text, either to

arrange to meet with Mr. Malan's doctors or by reiterating that Mr. Malan obtain a medical release. Instead, the record shows that Mr. Kimber repeatedly failed to respond to Mr. Malan's messages. (See, e.g., Kimber Dep. 120:1–10 (telling Mr. Malan that he was having breakfast and talking with someone and later failing to call back); Texts between Malan and Kimber dated July 11, 2018 (telling Mr. Malan he was at drum corps and failing to follow up); Texts between Malan and Kimber dated July 19, 2018 (telling Mr. Malan "I don't know how to answer that" in response to Mr. Malan's request to meet); Text from Malan to Kimber dated July 24, 2019 (failing to respond after Mr. Malan texted: "Please can you and I sit down to discuss things?").

In contrast, Mr. Malan has produced evidence that he met with Dr. Jensen twice (see Jensen Dep. 7:25–8:12, 27:3–15; Clinic Notes dated July 19, 2018), and that he informed Mr. Kimber about his progress in speech therapy, physical therapy, and his appointments with other doctors. (See Text from Malan to Kimber and Gould dated July 6, 2018; Text from Malan to Kimber and Gould dated July 10, 2018.) The Defendants suggest that, sometime on July 19, 2018, Mr. Malan "learned he was being terminated from someone on the management team at RKB" and only thereafter began sending text messages to Mr. Kimber about his returning to work and providing a medical release. (Defs.' Mot. Summ. J. 12 n.20, ECF No. 67; Defs.' Reply 15 & n.21, ECF No. 86.) This assertion is unsupported by evidence and belied by the record—as stated above, Mr. Malan provided his employer with several updates about his health in June and July of 2018, and the Defendants never requested additional information. The court finds that it is immaterial whether Mr. Malan learned of his imminent termination on July 19, 2018, and made a last effort to communicate with Mr. Kimber.

The court is similarly unpersuaded by the Defendants' argument that Mr. Malan could not perform the essential functions of his work because he was not physically at work. The

Defendants have produced no evidence showing that they asked Mr. Malan to return to work and that he refused—instead, the records demonstrate that Mr. Malan made repeated requests to come back.  (See, e.g., Kimber Dep. 120:22–25, 176:1–177:17 (referencing a call from Mr. Malan asking to return to work); Text from Malan to Kimber and Gould dated July 6, 2018 ("I am confident I will be able to start working again soon (a few hours a day at first)"); Texts between Malan and Kimber dated July 19, 2018 ("I would like to plan my return to work").)  A qualified individual under the ADA is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  The Defendants provide no evidence that they offered Mr. Malan a reasonable accommodation, such as reduced hours of work, or otherwise attempted to ascertain what was possible given his condition.  Instead, the Defendants simply assumed that Mr. Malan would be unable to perform the essential functions of his job after his accident.  But it is exactly this sort of assumption that the ADA forbids.

        In sum, in support of their contention that the court should deny summary judgment, the Defendants point to one ambiguous text in which Mr. Kimber may have asked Mr. Malan to provide a medical release (which Mr. Malan later provided) to argue that Mr. Malan should have done more to keep the Defendants informed of his health.  But "a mere scintilla of evidence" is insufficient to raise a genuine dispute of material fact, see Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993), especially where the Defendants have pointed to no text messages or other evidence in which Mr. Kimber or RKB Industrial tried to ascertain the true extent of Mr. Malan's injuries.

        Mr. Malan has produced unrebutted direct evidence that he was discriminated against because the Defendants regarded him as disabled.  There are no genuine disputes of material fact

remaining for a jury to hear on the elements of his second claim; the court therefore grants Mr. Malan's motion for partial summary judgment.

## II.      Disclosure and Calculation of Damages

The court's summary judgment ruling on Mr. Malan's second cause of action does not fully dispose of the case, as Mr. Malan asserts an additional (though largely duplicative) claim under the ADA and also asserts four causes of action that he added to his Amended Complaint for promissory estoppel, breach of an oral agreement, unjust enrichment, and breach of an implied-in-fact contract. (Am. Compl. ¶¶ 85–118.) Moreover, the parties dispute the damages to which Mr. Malan is entitled under the ADA. The court therefore addresses the arguments raised in the Defendants' motion for summary judgment. (ECF No. 67.)

The Defendants move for summary judgment on two issues related to Mr. Malan's disclosure of damages. First, the Defendants contend that Mr. Malan did not disclose his damages related to the causes of action he added to his Amended Complaint. Second, the Defendants move the court to exclude the section of the report prepared by Mr. Malan's damages expert, Gary Couillard, that calculates the amount of front pay to which Mr. Malan claims he is entitled for a violation of the ADA.

Rule 26(a) of the Federal Rules of Civil Procedure requires that, as part of its initial disclosures, a party must provide "a computation of each category of damages claimed by the disclosing party[.]" Fed. R. Civ. P. 26(a)(1)(A)(iii). Rule 26(e) requires a party to supplement its initial disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect …." Fed. R. Civ. P. 26(e)(1)(A). Finally, Rule 37(c) provides for sanctions for violations of these discovery rules: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not

24

allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).  A court may impose other appropriate sanctions, including a dismissal of the action in whole or in part.  See Fed. R. Civ. P. 37(b)(2)(A)(v), (c)(1)(C).

When determining whether a sanction is warranted for a discovery violation, the court should consider four factors: "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co., 170 F.3d 985, 993 (10th Cir. 1999).  Dismissal of a claim for violations of the initial disclosure rule is a severe sanction: "Discussing those factors, we have described dismissal as an extreme sanction, appropriate only when the aggravating factors like bad faith or willfulness outweigh the judicial system's strong predisposition to resolve cases on their merits[.]" HCG Platinum, LLC v. Preferred Prod. Placement Corp., 873 F.3d 1191, 1204 (10th Cir. 2017) (cleaned up).  Generally, courts have declined to exclude expert reports where the reports were disclosed "before expert depositions and well in advance of trial." Fed. Trade Comm'n v. Nudge, LLC, No. 2:19-cv-867, 2022 WL 823933, at *5 (D. Utah Mar. 18, 2022).

### A.  New Claims in the Amended Complaint

The Defendants argue that the four claims Mr. Malan added to his Amended Complaint should be dismissed for failure to disclose damages.  These claims relate to Mr. Malan's allegation that Mr. Kimber promised him a part ownership in RKB Industrial and that, in reliance on that promise, Mr. Malan did not complete his university degree or set up a retirement account. The court previously denied the Defendants' motions to dismiss these claims.  (Order dated

May 10, 2023, ECF No. 52.)

The Defendants are correct that Mr. Malan did not include a damages estimate in either his initial disclosures or in the first report filed by his damages expert, Mr. Couillard. But the court finds that Mr. Malan had good cause to omit this estimate. Mr. Malan served his initial disclosures on May 6, 2022. (See Pl.'s Initial Disclosures, Ex. 10 to Defs.' Mot. Summ. J., ECF No. 67-11.). He then timely moved to amend his complaint on June 23, 2022. (Pl.'s Mot. to Amend, ECF No. 15.) The Defendants stipulated to the amendment. (See ECF No. 19.) Five months later, the Defendants moved to dismiss the newly-added causes of action. (Defs.' Mots. Dismiss, ECF Nos. 35 & 36.) After briefing was complete, the court held a hearing on the motion on April 13, 2023. (Min. Entry dated Apr. 13, 2023, ECF No. 51.) The court issued its order denying the Defendants' motion on May 10, 2023. (Order dated May 10, 2023, ECF No. 52.) This date was after the deadline for the parties to file their expert reports: April 21, 2023, the date on which Mr. Malan did file Mr. Couillard's report. (Second Am. Sched. Order, ECF No. 44.) Mr. Malan then filed a supplement to Mr. Couillard's report, as well as a Supplemental Disclosure Statement, on June 8, 2023. (See Pl.'s Opp'n 31, ECF No. 81.)

The court finds that there was good cause for the delay in filing Mr. Couillard's supplemental report, as there was no reason for Mr. Malan to ask his expert for this type of damages estimate until after the court issued its order on the Defendants' motions to dismiss.

To the extent that the Defendants are arguing that Mr. Malan should have filed the supplement to his initial disclosures sooner, the Woodworker's factors do not suggest that a sanction is appropriate. First, the Defendants deposed Mr. Malan on February 23, 2023 (see Order Granting in Part & Denying in Part Mot. Extend Disc. Deadlines dated May 23, 2023 at 3, 8, ECF No. 62 (noting that the Defendants "chose to depose Mr. Malan near the end of fact

discovery, after two extensions"), long after Mr. Malan filed his amended complaint, and the Defendants had ample opportunity to ask Mr. Malan questions about the value of promised ownership. Similarly, the Defendants could have propounded an interrogatory asking for a computation of these damages. Additionally, the Defendants could have retained their own damages expert to compute this value. The court therefore finds little surprise to the Defendants and further finds that the Defendants could have cured any prejudice resulting from the late disclosure. Finally, the court finds no evidence of bad faith or willfulness on the part of Mr. Malan, who promptly provided a supplemental report about the amount of these damages after the court ruled that his claims could proceed.

Accordingly, the court denies the Defendants' request to dismiss the four later-filed causes of actions.

### B. Front Pay

The Defendants also dispute Mr. Couillard's calculation of front pay damages on the ground that Mr. Malan did not provide an estimate of these damages in his initial disclosures. The Defendants especially object to the statement in Mr. Couillard's report that, "[i]n terms of replacement employment, Mr. Malan meets the definition of being permanently disabled" for the purposes of computing Mr. Malan's lost future wages. (See Export Report of Gary R. Couillard 26, Ex. 2 to Defs.' Mot. Summ. J., ECF No. 67-3.) The Defendants point out that Mr. Malan has consistently maintained throughout this lawsuit that he was willing and able to perform his job at RKB Industrial.

In his initial disclosures, Mr. Malan listed his damages as follows:

Mr. Malan's lost back pay to date is approximately $368,000, which is based on nearly 4 years of backpay at his salary of approximately $96,000 a year.

…

27

> Plaintiff is also entitled to front pay and lost benefits, and prejudgment interest on his lost wages and benefits.
>
> Plaintiff anticipates retaining an expert, who will be disclosed as required under the rules, to calculate his total damages, including such elements such as lost pay and other economic damages.

(Pl.'s Initial Disclosures 3.)  The Defendants are correct that Mr. Malan did not include an estimate of his front pay damages in his initial disclosures.  But the court fails to see how Mr. Malan's late disclosure was either surprising or caused the Defendants substantial prejudice.

Mr. Malan has been forthright that he is seeking front pay, and that he planned to retain an expert to make this calculation, since early on in this action.  The Defendants had ample opportunity to question Mr. Malan—in a deposition or in interrogatories—about the amount of his front pay damages.  Moreover, the amount of front pay damages calculated by Mr. Couillard is unsurprising.  Mr. Malan is now 55 years old.  In his initial disclosures, he noted that his salary was approximately $96,000 a year.  The front pay damages figures of $1,083,358 to $1,358,890 calculated by Mr. Couillard represent approximately the number of years from now until the date when Mr. Malan would have retired (9.5 years to 12 years, depending on retirement age) multiplied by his yearly salary.  Although Mr. Couillard made some adjustments for inflation, his calculations are neither complex nor outside the ballpark range that the Defendants could have determined from Mr. Malan's initial disclosures.

The Defendants nevertheless claim that they would have altered their discovery strategy had they known that Mr. Malan intended to claim that he was permanently disabled for the purposes of calculating his front pay damages.  (See Defs.' Mot. Summ. J. 26.)  The Defendants are free, of course, to present evidence that Mr. Malan could have continued to work and thereby mitigated his damages.  Indeed, the Defendants explored this line of questioning during Mr.

28

Malan's deposition.  (Malan Dep. 69:21–70:18; 71:12–74:11; 158:11–159:1; 159:15–24.)  And

the Defendants were certainly aware that Mr. Malan had applied for and been awarded Social

Security disability benefits.  An earlier issue in this lawsuit was whether the Defendants had

complied with the expert report requirements for a proposed expert, Dr. Zabel, who had

interviewed Mr. Malan in connection with his Social Security application.  (See Order Granting

Mot. Exclude Expert Testimony dated June 23, 2023, ECF No. 78.)  The Defendants also could

have designated their own damages expert and could have deposed Mr. Couillard after he filed

his report.  Given these facts, the Defendants had notice that Mr. Malan believed he could not

work after he was fired and the opportunity to cure any prejudice resulting from their own

assumption that Mr. Malan would not be seeking all his future missed pay as damages.

To the extent the Defendants are arguing that—based on his testimony that he could

perform the essential functions of his work at RKB Industrial—Mr. Malan should be estopped

from arguing that he was unable to work after RKB Industrial fired him, the court notes that

there are different standards for disability in the ADA and in other statutory and regulatory

contexts, such as the Social Security Act.  To be protected by the ADA, a plaintiff must be a

"qualified individual with a disability," which means "that the individual satisfies the requisite

skill, experience, education and other job-related requirements of the employment position such

individual holds or desires and, with or without reasonable accommodation, can perform the

essential functions of such position."  29 C.F.R. § 1630.2(m) (emphasis added).  Unlike the

ADA, the Social Security Act does not consider whether an individual can work with a

reasonable accommodation. As a court in the Middle District of Alabama has explained,

> the Social Security Administration may find that a person is unable to do any
> work that exists in the national economy even though that person can work with a
> reasonable accommodation.  In those instances the person is both a person with a
> total disability under the Social Security Act and yet a "qualified individual with a

29

> disability" under the ADA.  Accordingly, a person claiming to be totally disabled
> or found to be totally disabled under the Social Security Act still may be entitled
> to protection under the ADA.

Sumner v. Michelin N. Am., Inc., 966 F. Supp. 1567, 1574–75 (M.D. Ala. 1997).[15]

Finally, the court notes that the Defendants' reference to Bella Monte Owners

Association, Inc. v. Vial Fotheringham, LLP, No. 2:19-cv-212-TC, 2020 WL 1809325 (D. Utah

2020), is unpersuasive.  That case concerned a malpractice action, in which this court upheld a

state court order granting a motion to exclude an expert report for failure to disclose a damages

estimate in the initial disclosures.  Id., at *2–3.  The state court order was never appealed to the

state appellate court and this court applied a deferential standard of review—abuse of

discretion—to the state court's interpretation of the Utah Rules of Civil Procedure.  See id.,

at *5.  For several reasons, the case is therefore not dispositive concerning how this court should

interpret the discovery requirements in the Federal Rules of Civil Procedure.

But beyond these procedural differences, Bella Monte also involved dissimilar facts.  In

that case, the plaintiff's attorneys did not include any estimates of the plaintiff's estimated

damages in the initial disclosures—and further refused to provide this estimate when asked

repeatedly in both interrogatories and emails from defense counsel.  Id., at *2.  The failure to

provide this estimate was prejudicial to the defendant contractors, who were unable "to

determine how best to allocate damages among the various subcontractors."  Id.  Finally, the

eventual damages estimate disclosed by the plaintiff's expert report was $6 million, later

---

[15] Other than the argument discussed above that Mr. Malan was not physically present at work
after his accident, the Defendants have not asserted that Mr. Malan was, in fact, unable to
perform the essential functions of his position and was therefore not a "qualified individual with
a disability" under the ADA.  Only Mr. Malan has presented evidence—in the form of his
deposition and in the letter from Dr. Jensen releasing him to return to work—about this issue.
Mr. Malan's ability to perform his previous job at RKB Industrial is therefore uncontested.

amended to over $7 million, which was grossly disproportionate to the estimate provided by the defendants' expert of $320,000.  Id., at *2–3.

None of these facts is present here.  As discussed above, the Defendants had the opportunity to explore the issue of damages during discovery and to test Mr. Malan's statements about applying for disability benefits and his inability to find work.  The estimate of projected front pay earnings provided by Mr. Couillard is not surprising given Mr. Malan's salary, and the Defendants had the opportunity to depose Mr. Couillard or provide their own expert on damages. At the very least, there remain disputed issues of material fact about whether Mr. Malan could find replacement work and how the court should determine his front pay damages.  These disputes preclude summary judgment concerning the amount of damages, and the court therefore denies the Defendants' motion on this issue.

## CONCLUSION

The court finds that there are no genuine disputes of material fact about whether Mr. Kimber and RKB Industrial fired Mr. Malan because they regarded him as being disabled.  The court therefore grants summary judgment to Mr. Malan on his second cause of action for a violation of the ADA.  The court denies the Defendants' motion for summary judgment on all issues.  But because Mr. Malan asserts additional causes of action, and because the parties dispute the amount of damages the court should award to Mr. Malan on his second cause of action, the court orders the parties to submit a joint status report (or, if the parties cannot agree, separate reports) within 30 days from the date of this order explaining whether there are any remaining claims or issues for trial.  If the parties cannot settle their remaining claims and issues, the status report should include counsel's trial availability from September through the remainder of the year.

## ORDER

For the foregoing reasons, the court ORDERS as follows:

1.      The Plaintiff's Motion for Partial Summary Judgment (ECF No. 54) is GRANTED.

2.      The Defendants' Motion for Summary Judgment (ECF No. 67) is DENIED.

3.      The parties must submit a joint status report (or, if they cannot agree, separate reports) within 30 days from the date of this order explaining whether any claims or issues remain for trial and providing counsel's trial availability from September until the end of the year.

DATED this 16th day of May, 2024.

BY THE COURT:

Tena Campbell
United States District Judge